Filed 12/22/21  P. v. Tamrat CA1/2
Opinion following rehearing

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| THE PEOPLE,<br><br>          Plaintiff and Respondent,<br>v.<br>HERMON TAMRAT,<br><br>          Defendant and Appellant. | A159390<br><br>(Sonoma County<br>Super. Ct. No. SCR722500) |

After a run-in with mall security guards over his use of an electrical outlet to charge a cell phone, defendant Hermon Tamrat was charged with assault with a knife, making attempted criminal threats, and exhibiting a deadly weapon, plus various enhancements and a strike prior.  At his preliminary hearing, defendant sought to represent himself, as he apparently had on previous occasions.  The court granted his request and, from the time of his arraignment after being held to answer at the preliminary hearing through sentencing, defendant served as his own lawyer.  The proceedings included multiple days of pretrial hearings on discovery, *Pitchess*[1] and other pretrial motions, a motion to suppress, motions in limine, a hearing on courtroom security, and belated attempts by defendant to disqualify the trial

---

[1] *Pitchess v. Superior Court* (1974) 11 Cal.3d 531 (*Pitchess*).

1

judge. When the trial court denied the disqualification motion just as jury selection was about to begin, defendant announced that he would not take part in the trial. Defendant thus absented himself from jury selection, and all trial proceedings thereafter including the taking of evidence (which lasted about one day). The trial court repeatedly offered to appoint the public defender, but defendant refused each time. Defendant appeared for posttrial motions and sentencing.

Defendant contends the trial court abused its discretion in not ordering a mental health evaluation to assess defendant's competency to represent himself when, after representing himself for many months, defendant made statements in court which, he now argues, constituted "compelling" and "substantial evidence" that he was affected by an "extreme, disabling mental illness." We find no merit to this argument.

Defendant also claims he is entitled to a reduction in his sentence under newly enacted Penal Code section 1170, subdivision (b)(6) (§ 1170(b)(6)), which goes into effect January 1, 2022. The Attorney General agrees the new law applies retroactively to defendant but argues remand is necessary to allow the trial court to make the appropriate findings under the new sentencing provision. We agree with the Attorney General and will remand the matter for resentencing in accordance with section 1170(b)(6). The judgment is otherwise affirmed.

## FACTUAL BACKGROUND

<u>The Underlying Crimes</u>

On December 2, 2018, a security guard at the Coddington Mall in Santa Rosa saw defendant charging his cell phone in an outlet that was not designated for that use. When the guard told defendant he couldn't charge his phone there, defendant lunged at him with a raised fist and starting

2

cursing at him in a raised voice. The security guard radioed for help, and two other guards arrived momentarily.

One of the security guards had a body camera, and a video recording of the incident was eventually shown to the jury. When a second guard walked up to defendant, defendant said, "Don't walk up on me. What are you doing?" He then pulled a pocketknife from his pocket. He "fake[d] a lunge" towards the guard threatening to "put holes in you."

A security guard warned defendant he would be pepper sprayed if he didn't leave. Defendant started to walk away but then turned to face the security guards again. A guard pepper sprayed defendant, who then "rushed" the guard, knife in hand, and tried to stab him in the abdomen.

After 911 was called, Santa Rosa police officers arrived at the scene. Defendant yelled at the officers, who eventually handcuffed defendant. A folding knife with a three to three-and-a-quarter-inch blade was found in defendant's pants pocket.

The Procedural History of This Case

At his arraignment on December 7, 2018, defendant told the court he "was falsely imprisoned" and "the police stole $300 from my pocket when I got arrested." He said he had been falsely imprisoned multiple times before, but the cases always got dismissed because they were false. (As will be seen, defendant's consistent refrain was that he was always the victim in his interactions with law enforcement and the system was "rigged" against him.)

On December 20, 2018, defendant made his first *Marsden*[2] motion, which was denied.

_____

[2] *People v. Marsden* (1970) 2 Cal.3d 118 (*Marsden*).

3

At the preliminary hearing on January 25, 2019, before Judge Peter Ottenweller, defendant mentioned his interest in self-representation.[3] Defendant was held to answer, and he made a second *Marsden* motion which was denied. The court told defendant he could let the court know at the next hearing how he wished to proceed on self-representation.

At the arraignment on February 7, defendant asked to represent himself, the court gave him a *Faretta* waiver form to complete, and defendant filled it out. The court granted defendant's request to represent himself, finding he "has the mental capacity to make a lawful waiver of the right to counsel. He has been advised by the *Faretta* form of his constitutional and statutory rights. He understands all of those rights. He has made an express, explicit, voluntary, willing, knowing and intelligent decision to represent himself."

Defendant then requested a court-appointed investigator to assist with pretrial discovery. Anthony Hopkins was appointed as his investigator.

Over the course of five hearings in February and March, defendant engaged in detailed discussions with the court and the prosecution about discovery.

At one of the hearings, the court indicated it was going to review unredacted video evidence in chambers, and defendant reacted with distrust and began complaining about his treatment in jail. He stated, "So I'm supposed to just trust you guys right now like that? . . . [N]o disrespect, . . .

---

[3] Just as the first witness was being sworn, defendant said he wanted to represent himself. The court gave defendant a written *Faretta* form. (*Faretta v. California* (1975) 422 U.S. 806 (*Faretta*).) However, after some discussion between defendant and defense counsel, counsel stated defendant wanted a continuance to review the evidence. The prosecution objected, and the court denied a continuance, noting there had been no time waiver.

4

[¶] . . . I'm having a hard time in this jail right now." Defendant claimed his "pro per rights" were being violated. The court said it would find out from the pro per coordinator at the jail whether accommodations were being made for defendant to prepare for trial and the court would get involved if there were not. When the court ordered the bailiff to take defendant back to jail, defendant became hostile toward the court. He accused the court of "basically working with them [the jail]. I already knew, you piece of shit. You're a piece of shit, too. You know that videotape is edited too and tampered with illegally. Fucking piece of shit."

The next two hearings on discovery were uneventful. Defendant answered questions, said he understood answers, and made no outbursts.

On May 1, there was a lengthy pre-trial proceeding at which the court granted many of defendant's requests for discovery and discussed with defendant and his investigator the logistics of viewing video footage in jail and subpoenaing witnesses.

At another pretrial hearing on June 17, defendant asked for advisory counsel to help him write, claiming that his writing arm had been injured by the sheriff. The court denied the request on the ground that this was not an appropriate basis for advisory counsel. The court reminded defendant he could reconsider whether he wanted to be represented by a public defender.

At the next hearing on July 24, defendant filed a *Pitchess* motion which the court set for hearing. The trial court again asked defendant whether he would like a public defender appointed to represent him. Defendant was firm and repeatedly said no. At the close of the hearing before leaving the courtroom, defendant stated, "Kangaroo court."

At the next hearing on August 30, the *Pitchess* motion was taken off calendar because it had not been properly served. Defendant objected to the

court dropping the *Pitchess* motion from calendar and accused the judge of bias. Again, he called the court a kangaroo court.

When court reconvened that afternoon, defendant made rude remarks and said, "You feel good about yourself taking me away from what I had going on, losing my job, losing my tax money now since I've been falsely imprisoned?" The hearing resumed. The trial court denied defendant's further motion for advisory counsel, and defendant then argued at length against the ruling. The court reminded defendant of his *Faretta* waiver form. "I'm going to read to you what you signed in February of 2019. . . . [¶] . . . [I]t lists your constitutional rights, that you have read and understood them. It asks in there whether you can read and write English. You marked yes. Do you have any mental illness or disability that would impair your abilities? You said no." The court continued to read the representations made by defendant on the waiver form,[4] and concluded, "So Mr. Tamrat, I'm going to ask you again, do you wish me to appoint a Public Defender to represent you in this matter? Yes or no?" Eventually defendant replied in no uncertain terms that he did not want a public defender.

When the court tried to set the next date for the case, defendant interjected that he wanted to address the *Pitchess* motion. The court warned defendant if he did not "respect [the court] by using the word kangaroo court, I will then find you in contempt with various sanctions that apply to it." Defendant responded that the court had not "been treating me with respect based on your abuse of discretion just because I represent myself and you thought I was just a dumb street punk, I already know that, but you see that

---

[4] Including that defendant understood the "numerous disadvantages to representing myself," such as having to follow the same rules of procedure as a lawyer and not getting special treatment from the bench.

. . . I have some skills." Defendant and the court engaged in extended colloquy about the *Pitchess* issue. Defendant lashed out against the judge and the prosecutor saying he knew "these little games" they were playing and made repeated references to a kangaroo court.

At a hearing on September 11, the court asked defendant if he had any objection to the court reviewing records subpoenaed by defendant for relevance, outside the parties' presence. Defendant objected that he did not trust the court or think it was fair. After that, the court and parties discussed discovery and trial witnesses at length. Defendant informed the court that some defense witnesses would testify about his character and mental health.

On September 16, the court conducted a lengthy evidentiary hearing on the issue of courtroom security[5] in which defendant fully participated; the transcript ran to about 100 pages.

To support its request that defendant be restrained at trial, the county presented evidence defendant was dangerous and threatening in jail and his behavior was disrespectful in court.

Sergeant Michael Patrick from the sheriff's department testified that defendant was "classified as an Administrative Segregation, level three, . . . behavior problem, with an internal behavior code of Z." Administrative segregation was for people who "pose[ ] a serious threat to the safety of our staff, other inmates or our facility, and you do not have major mental health concerns." "[B]ehavior problem" refers to inmates who are "acting out regularly, by showing a disregard for facility rules, for lack of adhering to the

---

[5] The county counsel, on behalf of the sheriff's department, had requested an order to place defendant in restraints during trial. Defendant had filed a motion to appear without restraints.

rules within the units and following staff's directions." Patrick testified that code "Z" generally "indicates an inmate is prescribed or is tracked for mental health medications," but he was "not privy" to why defendant was so classified.

Defendant objected that he was "not a mental health issue" and he had never talked to mental health staff at the jail.

Patrick described defendant's behavior in jail as "[d]angerous, threatening and of definite concern regarding the safety and security of our facility." In his view, when defendant "receives negative information or things do not go in the direction he likes, there's a probability that he would act out or be verbally aggressive toward staff. How that translates into the courtroom would definitely be a concern."

Steven Nelson, a bailiff, testified about defendant's demeanor in the courtroom in the preceding months. According to Nelson, defendant usually "behave[d] himself during court proceedings until . . . towards the end of the proceedings." Then "if [defendant] has further things that he wants to talk [about] and the Judge . . . advise[s] him that he's done for that session, he becomes verbally abusive to the Judge, to the staff, and usually that continues out the door and then down the hallway . . . ." In Nelson's three-and-a-half years of working as a courtroom bailiff defendant's verbal behavior was the worst he had seen.

Defendant strongly disputed Patrick's testimony about his jail behavior. He argued jail staff had "tainted his file with false evidence, false statements" and had been harassing him since his arrest on December 12 because he wrote grievances and exercised his rights.

On September 17, the judge gave his tentative ruling on the security issue that defendant's feet would be secured to a bolt underneath the

8

courtroom desk, but his hands would not be restrained, and he could use a soft pen at trial. Defendant would not be secured to his chair, nor did the court agree to the other restraints the deputies had requested.

In what comes across as measured tones even on the written transcript, the judge reasoned:

"I have been the Judge throughout Mr. Tamrat's case here in Department 10. He has appeared in front of me probably 20 times or more. My observations of Mr. Tamrat, he has never been physically aggressive while in the courtroom. He has . . . at times . . . been disrespectful in his language here in the courtroom, but except for comments regarding reporting myself or the attorneys or the staff to various disciplinary tribunals, he's never threatened the Court, nor . . . am I aware that he has threatened any of my courtroom staff. So, in other words, while I think Mr. Tamrat's behavior at times has been disruptive . . . I've not found him to be [physically] aggressive."

The court further observed, "I also heard that there are times Mr. Tamrat can behave himself and act accordingly and there are times that when he is triggered or when he . . . feels that he is being discriminated against or picked on or treated unfairly, that he acts out in a verbally abusive manner which also can translate into physically aggressive behavior."

The same day, the court heard a motion to suppress; defendant cross-examined an officer at length and made a detailed closing argument, citing cases.

September 18, 2019, brought another lengthy day of pretrial motions and rulings. Defendant told the court one of his prospective character witnesses, Salmon Tedla, would address defendant's "mental health" and "traumatic incidents" in his life that resulted in a PTSD diagnosis.

9

Defendant also noted his proposed exhibit of the definition of PTSD, which he intended to use to argue to the jury that he "went into defensive mode" at the mall because "when they performed the tactical maneuver around [him]," he was "triggered" to act "in defense."

After establishing that Tedla was not a doctor, the court explained to defendant that Tedla's proffered testimony about PTSD was not proper for a layperson. Defendant responded that Tedla would only testify about "these incidents" that defendant went through and that none of his witnesses would act as doctors or "mention anything with PTSD."

The court took a recess and addressed motions in limine. Defendant worked his way through the motions, showing his familiarity with the process.

Defendant's consistent theme was that he had been subject to a biased investigation and false statements; he said he filed a citizen complaint against the officers in his case for excessive force,[6] and he was "truly the victim" in the incident. He also believed money had been stolen from him at booking.

The trial court showed exceptional patience with defendant. The court explained to defendant that he could testify to previous fighting or threat incidents to explain his behavior, but he could not self-diagnose PTSD.

After additional argument about whether defendant's written definition of PTSD was admissible as an exhibit, defendant claimed the judge was "basically railroading me," and that "[y]ou guys got to cheat me to beat me." The court explained that PTSD was a matter for expert opinion, that without

---

[6] The court said the citizen complaint was inadmissible because defendant had not been charged with resisting arrest or battery on a peace officer.

an expert, the definition proffered by defendant was hearsay and irrelevant, and that the court had authorized funds for defendant to retain an expert, but he had not done so. Defendant repeated the refrain that he was being cheated and railroaded.

Defendant objected on the grounds of relevance to the pocketknife recovered from the incident at the mall being displayed during trial. After the court overruled the objection, defendant addressed the court, "Also, I would like to let the record reflect that I will not get a fair jury panel. I will be prejudiced due to the fact that I've been subject [to] harassment from the FBI and other law enforcement agencies. It's a well-known fact. You don't have to play this little game. Everybody knows what going on. So I would never be able to get a fair trial based on that fact. And I could bring witnesses in on what I'm saying right now." Defendant said he would like a change of venue.

Defendant then made the statement he now relies on as evidence of severe mental illness. Complaining about harassment by the FBI, defendant said: "It's viral, you know, a lot of people are involved in this, relatives know[ ] that. The FBI implanted something in me illegally, messed with me in my head and my body and continue to do it in this jail as well, in the cell. [¶] It's a bunch of things. It's too—you wouldn't even be found to understand. I would have to sit you down. It's not no conspiracy. I have witnesses, relatives that witness some phenomenal experience with their eyes."

Defendant continued: "They know that I am subject to harassment . . . . And a lot of people know about me. What it is, I don't know, but it's a lot of things being said about me. I walk down the street and . . . it's hard to explain, but trust me it's—everybody knows me for some reason. This is not no crazy talk or nothing. Like I said, I could bring witnesses which are

11

relatives and other people in this regards. I will not be subject to a fair trial. I will be prejudiced automatically due to that fact and everybody is well aware so . . . . [¶] You know what I'm talking about, he does, he does, the Sheriff does, the stenographer, everybody knows what's going on. [¶] So, you know, I would not be subject to a fair trial and I'm letting that be known, and I could bring witnesses, but if you deny me that, then, hey, oh well, it's more of appeal. That's about . . . the 10th reason I could appeal this case if I get falsely convicted. Because I got a bunch of appeal reasons . . . with you and this courtroom, this kangaroo court. So I'm not worried about it, plus I got my Habeas Corpus, but I will submit that. I will not get a fair trial."

The prosecutor then brought to the court's attention an email he received from defendant's investigator Hopkins—an interview summary of proposed defense witness Tedla, who was defendant's uncle—which the prosecutor suggested was relevant given defendant's comments "regarding the FBI and his mental state." According to Hopkins's summary, Tedla believed defendant was "highly anti-social, has no friends or social life, was extremely paranoid, believed federal agents were monitoring him and surveilling him, [and] believed his uncle [Tedla] was conspiring with federal agents against him."[7]

---

[7] At this point, defendant stated he had been harassed for years and, "I would not get a fair trial based on the jury panel because everybody knows, this is viral . . . . All that . . . dumb stuff going on. . . . Everywhere I go on the street, somebody—when they walk right by me. . . . [¶] And my relatives know . . . I'm being targeted. They know what's going on. They're doing a bunch of illegal stuff, the FBI and other authority, law enforcement, government authority, they're doing some illegal stuff, and I'm subject to a lot of harassment for a lot of years . . . ." Defendant correctly referenced the trial court's earlier ruling that Tedla could not testify to the diagnosis of PTSD since he was not an expert.

The prosecutor observed that defendant's "statements to the Court . . . seem to devolve into some rather paranoid expressions" and reminded the court of its "authority under Evidence Code 730," suggesting "perhaps you have Dr. Correa take a quick look . . . ."[8]

The trial court did not think defendant required a mental health evaluation, explaining: "The Court at this point does not believe a further evaluation by Dr. Correa would be in order. . . . [W]e have spent almost three full days with Mr. Tamrat discussing somewhat sophisticated legal issues. Mr. Tamrat seems to be following along. While he has in his remarks to the Court again continues to be disrespectful in not only the Court but announcing how the proceedings are rigged against him, which does show some paranoia, this can also be from Mr. Tamrat's own personal experiences that he is relating to. [¶] So I don't believe that his comments here about a chip in his body from the FBI and those kind of things will interfere with his ability to understand the nature of the charges and to represent himself in this matter."

After a break, the trial court moved on to more pretrial motions and matters. The court spent a considerable amount of time going over the jury selection process, including the kinds of questions that could be asked in voir dire. Defendant told the court he "kn[e]w the questions to ask," but felt the

---

[8] Evidence Code section 730 provides the court authority to appoint an expert to investigate and testify "as an expert at the trial of the action relative to the fact or matter as to which the expert evidence is or may be required." The parties do not identify who Dr. Correa is and have not pointed us to anywhere in the record where he is mentioned. Nor have they pointed us to anywhere in the record that indicates that the court, the prosecutor, or the defense counsel (before defendant began representing himself) ever expressed a doubt about defendant's competence to stand trial under Penal Code section 1368.

13

process was rigged against him. "It's me versus this courtroom. . . . [Y]ou're against me, and . . . that's facts." The court turned to peremptory challenges and how they are exercised, as well as how a challenge to the panel could be made. Defendant repeatedly indicated he understood what the court was saying.

Then defendant stated he wanted to exercise his "peremptory challenge in recusing you as a judge because every defendant has one challenge as far as that." The trial court denied the challenge as untimely.

The court moved to jury instructions; later, defendant brought up an issue of discovery noncompliance. Just before the close of proceedings for the day, the trial court addressed defendant, "I'm going to give you another opportunity to consider having the Public Defender reappointed to represent you on this case. Do you wish to have me reappoint the Public Defender to represent you on this case?" Defendant identified by name one attorney from the Public Defender's Office he would accept. When the court said it didn't determine who would be assigned to the case, defendant said, "Yeah, if it ain't her—I probably think about it. Other than that, I'm cool. I don't want to." And he added, "If it's not her, that's about it."

At the next hearing on September 20, defendant filed a statement of disqualification against Judge Ottenweller.

On September 23, the court stated it was striking the statement of disqualification and handed out copies of its written order. Defendant read the order and then he engaged in colloquy with the judge about the case authority cited by the court, disputing its relevance, and arguing that his motion had been made "at the earliest practicable time" as required by the law. Defendant elaborated on his reasons: "It came . . . to my thinking that on . . . September 18, 2019, is when I determined you are very bias[ed]

against me, not only that, but have also committed prejudice against me, have been prejudiced against me by your actions . . . ." His reasons were based on trial court rulings on the admissibility of evidence pertaining to defendant's alleged trauma.

Defendant argued several grounds of prejudice, all related to the court's rulings on various pretrial motions. He said the court tried to force him to "relinquish my pro per status." Again, defendant cited case law, at length, concluding that his motion for disqualification was "timely" and that the court was not proceeding "in the right way," and the court's actions "fall[ ] under the norms of misconduct." When the court asked whether defendant had "anything else . . . on the disqualification issue," defendant declared he was refusing to participate.[9]

The court returned to the logistics for the next day's trial proceedings. The court stated that it was prepared to bring in the jury panel, and defendant interjected that he "refused to participate."

The court announced that they were waiting for the jury panel to come into the courtroom to be sworn, and that 18 would be called to the jury box. Defendant persisted, "I refuse to participate in this illegal proceeding[ ];" he was exercising his "one and only peremptory challenge;" and the judge was "excused." Defendant stated that the judge had not finished hearing in limine motions, and it was improper to move on to selecting the jury. "I refuse this proceeding. I would like to go back." Despite repeated requests from the bailiff, defendant stood up and would not sit down. "I refuse to

---

[9] He stated, "I refuse to take part in this. Since this is illegal and this is unlawful, I refuse to take part in any of this proceeding today or until we go about it the right way, until the Judge goes about this the right way as far as the disqualification motion I filed." [¶] So I refuse—I will remain silent . . . I refuse to participate."

15

participate in this illegal proceeding by law— . . . [¶] I'm entitled to that."
Defendant also asked for transcripts of prior hearings to file a writ, listing all
of the hearing dates.

The court ruled the peremptory challenge under Penal Code section
170.6 filed that day was denied as untimely, as was the challenge defendant
had filed a few days earlier. The court told defendant it was to his benefit to
stay in the courtroom while the jury was selected. Defendant interjected
again "I refuse," and the court said: "If you insist on being removed for your
jury trial, I'm prepared to go ahead and continue picking a jury in your
absence."

Defendant reiterated his refusal to participate and insulted the court.[10]

Unfazed, the court responded, "So, Mr. Tamrat, do you want to sit here
while we pick a jury?" Defendant responded in the same vein. The court
continued, "I heard you twice before that. . . . [¶] And you're trying whatever
you need to do to get some reaction from me so you can challenge me in the
case. [¶] So the question is are you prepared to sit down here while we pick a
jury?"

Defendant said, "By law, I have that right to refuse to participate.
[¶] And I asked—let the record reflect that I asked to have more time as far
as this is judgment—this is cause right here to waive this jury panel
selection. . . . [¶] That's how I feel about your courtroom. I spit on the floor."

The trial court sought to clarify whether defendant was seeking a
continuance and waiving his right to a speedy trial; the court indicated jury

---

[10] He said, "I will not come back to court again. . . . [¶] You can go on
with this illegal proceeding, you piece of shit. Go ahead. I'm not worried
about it. That's what you are. You are a white devil with this little cracker
system. You're nothing but a white devil that abuses authority. You're a
piece of shit. And you know that."

selection would begin if not. Defendant did not respond directly but stated, "I choose to exercise my right to not participate in—I do not want to be in this illegal—this corrupt courtroom. [¶] So you may go ahead and cuff me up and get me out of here." The bailiff and defendant's investigator urged defendant to stay seated. Defendant responded, "I refuse to participate in this illegal corrupt courtroom."

The judge responded, "All right. Then let's bring our jury panel in if we could[,] so we can start up the jury selection process." Without prompting, defendant said, he wanted to be taken "back to my cell."

Th trial court cautioned that he thought this "is not a good idea on your part. I think the jury would want to see you and actually hear from you in this case." And again the court asked, "do you want to sit here and be part of these proceedings or do you want to be taken back up to your cell."

Defendant said, "I refuse to take part and I will be filing a habeas corpus because you're holding me hostage at this point. And I'm definitely filing that misconduct to the judicial commission of San Francisco." He reiterated his request for transcripts of all of the proceedings.

After defendant left the courtroom, with the prosecutor, defense investigator and court staff present, the trial court made "some observations . . . so the record is more clear in this case." The judge said: "While Mr. Tamrat was being asked by me whether or not he would participate in this trial, he got up out of his chair. The bailiffs asked him to get back into his chair. He did not physically resist, but did not get back in his chair.

"He then sat down in his chair, I think primarily at the urging of Mr. Hopkins [investigator], and started formulating spit in his mouth where my bailiff pulled out a spit guard in case he was going to spit. He then, I believe, dribbled some spit onto the ground from his chair.

17

"There was further discussion. He then got up again. The bailiffs again ordered him back in his chair. Again, I believe he got back in his chair because Mr. Hopkins encouraged him to do so and he got back in his chair."

As to defendant's self-representation, the prosecutor commended the court for "zealously safeguard[ing defendant's] right to represent himself," but believed there was good cause for a continuance (presumably to appoint counsel) because defendant was "completely unable to abide by rules of procedure and courtroom protocol . . . ."

Following a recess, defendant was back in the courtroom, along with his investigator and the prosecutor, and the court noted defendant agreed to be there. The court made clear the trial would go forward whether defendant was present or not and explained the mechanics of how it would proceed in his absence, concluding "I just want you to be aware without you being here, all of those things are going to happen. [¶] So do you wish to be removed from the courtroom and back to your cell?" Defendant said "[y]es, I do," and engaged in more name calling against the judge, stating he was being "held hostage" by the judge.

The prosecutor suggested the court could deny a request for self-representation "when the defendant is unable or unwilling to . . . abide by rules of procedure and courtroom protocol," citing a treatise. He observed the record was "replete with disorderly, disruptive and disrespectful behavior evidencing an inability or unwillingness to abide by rules of procedure and courtroom protocol" and, further, even if a defendant is competent to stand trial, he "may not be competent to conduct the trial proceedings by himself and may be denied the right of self-representation."

Defendant objected to the prosecutor's statements and chastised the court as "corrupt, tainted, you perform misconduct." At that point the trial

18

court addressed the bailiff and asked that defendant be taken back to his cell. Before he left the courtroom, defendant once again told the court that it was breaking the rules and called him a "wannabe" judge.

The prosecutor then stated that the "prudent course of conduct at this point is that [Mr. Tamrat] be denied his right to continue with self-representation, that we have a Public Defender appointed, and we go through that process, whatever that process looks like, whether it involves an eventual *Marsden* motion, whether it involves ultimately him representing himself. [¶] We're not going to continue to invite jurors down to the courthouse and go through this rigamarole indefinitely, but the more robust record that we have built, the safer we are going to be if and when reviewed by an appellate Court."

The court disagreed with the prosecutor's suggestion that defendant was not competent to represent himself. The court explained its "view of the case after researching this issue" as follows. "We have started this trial. We started the trial with in limine motions on September 16th and we went through three full days of in limine motions with Mr. Tamrat as well as [his investigator] being present. . . . [¶] Mr. Tamrat during that period of time exhibited to me an understanding, a rudimentary understanding, of the law. He filed in limine motions, he argued in limine motions, and in this Court's opinion had done research while in custody, had written up his own motions, he had written up a motion to suppress and participated in the motion to suppress which was during our in limine motions in which a witness was on the stand and which he questioned the witness I believe in a substantive way. [¶] So therefore, I do believe that he is competent to—still competent to represent himself.

19

"It was not until he came close on the day of trial, which was the trial call on Friday, the 20th, that he filed his disqualification declaration, and then on the actual day to select a jury when the Court issued its order striking the disqualification, Mr. Tamrat continued on with a theme that he has utilized since February in this case when he went in pro per, February 2019, that the trial was bias[ed], the participants in the trial were bias[ed] against him, and this has been a continuing theme with him.

"He has expressed that the jail personnel are bias[ed] against him, have violated his rights. He has expressed numerous times that this Court has violated his rights and that he could not get a fair trial. He has continually, I believe, had the philosophy that because of who he is, he could not get a fair trial in any courtroom no matter where it was.

"So with that, I'm bringing that up because this is not new or aberrant behavior on his part. This is consistent throughout, and when I bring up that it's been consistent throughout, it is however you want to term it on his part a consistent philosophy that he has brought to these proceedings.

"So he has totally requested that he represent himself. The Court has explored with him the danger of doing so a number of times. He has refused the Court's invitation to have counsel appointed for him. When counsel was appointed for him, we had a *Marsden* motion for him to remove that counsel, and when that was not granted, he then went in pro per.

"So with that said, I believe he knows what he's doing. I believe his conduct is calculated here to what he's doing and is consistent with his belief that he cannot get a fair trial even if he participated in any way, shape or form in this case."

The court concluded that "[defendant] has voluntarily absented himself from these proceedings. I believe if I were to go down the road that [the

20

prosecutor] is suggesting in the case, that we would be here a year from now in the same situation, and just as [the prosecutor] said, where we might be, who knows, with a jury being out in the hallway and with that uncertainty. [¶] [Defendant] is not going to run my courtroom, and so I'm going to run my courtroom and we are going to start up with jury selection."

The prosecutor noted that the court had given defendant "repeated opportunities to simply ask the Court for more time and he has failed to do that" and then submitted on the court's ruling

The next morning, when the court called the matter for jury trial and defendant was not present, the court (outside the jury's presence) asked for a report on defendant's status. The bailiff told him that defendant had gotten dressed in his civil clothes but then told jail staff he did not want to be in court today and would be there tomorrow. The court stated that "the Court made an order that Mr. Tamrat be dressed out and be ready to come into Court this morning at 10:30 a.m. Again, Mr. Tamrat has decided to absent himself from these proceedings, and the Court is prepared to go forward with the proceedings in his absence."

The next court day, defendant did appear. Outside the presence of the jury, the court asked him if he intended to present a case (the prosecution having finished its case) and whether defendant would stipulate that two documents could be admitted in evidence. Defendant responded by objecting "to everything going on in this kangaroo court with this trial" and maintaining that the proceedings were unlawful "since I filed my . . . disqualification motion." The court checked whether defendant was going to give an opening statement or present witnesses, and defendant again objected to "this illegal and unlawful proceeding taking place which is this trial." Defendant then asked to file a motion to dismiss for vindictive

21

prosecution and "head back to my cell," objecting to "being here in this kangaroo courtroom." He said, "you got to cheat me to beat me" as he left the courtroom.

On December 19, defendant was present in the courtroom for post-trial proceedings. The case had been continued to that day for defendant to prepare a motion for new trial, but on December 19 he stated he wanted a ruling on his Penal Code section 1385 motion to dismiss. Defendant stated that he already knew the court would deny the motion because "you're corrupt" and "not an honorable judge," and it had been a "kangaroo courtroom" since "the start." The court put the matter over for ruling and possible sentencing later that afternoon. Defendant stated, "you're white devils" and, "you cost me a lot of losses," accusing the court and the prosecutor of "working together to falsely imprison me, man, but it's gonna cost you, I guarantee that. It cost me my job, my tax return money. It cost me a bunch of losses." Defendant would not come to court at 1:30 p.m., so the court continued the matter.

On December 27, defendant was in court for sentencing. First the court heard lengthy argument from both sides on the Penal Code section 1385 motion. The court explained its reasoning and denied the motion, which again resulted in defendant calling the court names. The trial judge stated, "The Court does believe Mr. Tamrat has explained at various times . . . that he suffers from posttraumatic stress disorder as a result of either his upbringing or his time in custody, and the Court does acknowledge that . . . and would give credibility to that aspect of Mr. Tamrat's behavior, or it's a reason for his behavior and personality. And so the Court did consider that aspect of Mr. Tamrat's background and experience, but that was not sufficient to overcome the serious nature of this case and the strike."

22

Defendant continued to argue against the ruling and the prosecutor's view on sentencing. The trial court repeatedly asked defendant for his view on his sentence, and he said "For me being falsely imprisoned and you . . . trying to protect other white people, your fellow white men, for committing a battery on me . . . on video camera . . . [¶] that they manipulated, edited and tampered with on top of that?" Defendant went on, "The appropriate sentence? So this is like comedy for you . . . ." Defendant said that the court should dismiss all charges because he was "falsely imprisoned."

When the court stated, "Mr. Tamrat, nothing further," defendant replied with more epithets.

The court asked the bailiff to remove defendant from the courtroom, as defendant continued to utter expletives and rude remarks. Defendant's spit hit the court reporter, but not the court.

The court then completed pronouncement of the sentence, without defendant present. As to factors in mitigation, the court stated, "I do believe that Mr. Tamrat suffers not from a psychiatric condition but from some other condition in which he feels validly to him. The Court doesn't find this in either the prosecution in this case or otherwise, but Mr. Tamrat genuinely feels that he is victimized both because of his race and his socioeconomic status. In this matter he did not use . . . an attorney in the case, which I believe severely prejudiced his matter from not only the trial in the case" but also in posttrial motions to place him in a better position for sentencing. The court stated "for that reason," it sentenced him to the mid-term on count 1, imposed the remaining sentences concurrently, and exercised its discretion to strike defendant's five-year prior serious felony conviction under Penal Code section 667, subdivision (a). While the prior strike was for a violent offense, "the underlying case here, again, was Mr. Tamrat, I believe, acting out after

23

being confronted and aggravating the situation again because, I believe, he feels victimized because of his race and socioeconomic status."

## DISCUSSION

### A.

Defendant does not contend he was incompetent to stand trial. He does not contest that his *Faretta* waiver was voluntary, knowing and intelligent. He does not claim there was error in his absence from the trial.[11] He does not allege any errors in the conduct of the trial or his sentence. Defendant raises one narrow claim: the trial court "abused its discretion in failing to order an evaluation or a hearing to assess [defendant's] competence to represent himself."

The Sixth Amendment right to a defense necessarily includes the "right to self-representation." (*Faretta, supra,* 422 U.S. at p. 819.) "In *Indiana v. Edwards* (2008) 554 U.S. 164 (*Edwards*), however, the United States Supreme Court held that states may, but need not, deny self-representation to defendants who, although competent to stand trial, lack the mental health or capacity to represent themselves at trial—persons the court referred to as 'gray-area defendants.' " (*People v. Johnson* (2012) 53 Cal.4th 519, 523 (*Johnson*).) "*Edwards* described competence to represent oneself at trial as

_____

[11] By statute, a defendant can waive his right to be present at trial in a non-capital felony case where he voluntarily absents himself from trial. (Pen. Code, § 1043, subd. (b)(2).) Moreover, although it did not happen here, defendant could have been removed from the trial if, "after he has been warned by the judge that he will be removed if he continues his disruptive behavior, [he] nevertheless insists on conducting himself in a manner so disorderly, disruptive, and disrespectful of the court that the trial cannot be carried on with him in the courtroom." (Pen. Code, § 1043, subd. (b)(1); see *People v. Espinoza* (2016) 1 Cal.5th 61 [trial court did not abuse its discretion in proceeding with trial when self-represented defendant voluntarily absented himself from trial].)

24

the ability 'to carry out the basic tasks needed to present [one's] own defense without the help of counsel.' [Citation.] It . . . said the states *may* deny self-representation to those competent to stand trial but who 'suffer from severe mental illness to the point where they are not competent to conduct trial proceedings by themselves.' [Citation.] Although asked to 'adopt a more specific standard,' the high court declined to do so." (*Johnson, supra,* 53 Cal.4th at p. 530, italics added.)

The California Supreme Court in *Johnson* also explicitly declined to adopt a more specific standard. "[W]e believe the standard that trial courts . . . should apply is simply whether the defendant suffers from a severe mental illness to the point where he or she cannot carry out the basic tasks needed to present the defense without the help of counsel." (*Johnson, supra,* 53 Cal.4th at p. 530.)[12]

The *Johnson* court then discussed how this would work in practice. "A trial court need not routinely inquire into the mental competence of a defendant seeking self-representation. It needs to do so only if it is considering denying self-representation due to doubts about the defendant's mental competence. When a court doubts a defendant's competence to stand trial, it 'shall appoint a psychiatrist or licensed psychologist, and any other expert the court may deem appropriate, to examine the defendant.' (Pen. Code, § 1369, subd. (a).) Similarly, *when it doubts the defendant's mental competence for self-representation, it may order a psychological or psychiatric examination to inquire into that question.* To minimize the risk of improperly

---

[12] The issue in *Johnson* was "may California courts deny self-representation when *Edwards* permits such denial?" And if so, whether the trial court in Johnson had properly denied self-representation in that case. (*Johnson, supra,* 53 Cal.4th at p. 525.) The *Johnson* court answered both questions in the affirmative.

denying self-representation to a competent defendant, 'trial courts should be cautious about making an incompetence finding without benefit of an expert evaluation, though the judge's own observations of the defendant's in-court behavior will also provide key support for an incompetence finding and should be expressly placed on the record.' " (*Johnson*, *supra*, 53 Cal.4th at pp. 530-531, italics added.)

The *Johnson* court admonished that "[t]rial courts must apply this standard cautiously. . . . Criminal defendants still generally have a Sixth Amendment right to represent themselves. Self-representation by defendants who wish it and validly waive counsel remains the norm and many not be denied lightly. A court may not deny self-representation merely because it believes the matter could be tried more efficiently, or even more fairly, with attorney on both sides. Rather, it *may* deny self-representation only in those situations where *Edwards* permits it." (*Johnson*, *supra*, 53 Cal.4th at p. 531, italics added.)

We review a court's determination on self-representation with a large degree of deference. "As with other determinations regarding self-representation, we must defer largely to the trial court's discretion. [Citations.] The trial court's determination regarding a defendant's competence must be upheld if supported by substantial evidence. [Citation.] Such deference is especially appropriate when, as here, the same judge has observed the defendant on numerous occasions. '[T]he trial judge . . . will often prove best able to make more fine-tuned mental capacity decisions, tailored to the individualized circumstances of a particular defendant.' (*Edwards*, *supra*, 554 U.S. at p. 177.)" (*Johnson*, *supra*, 53 Cal.4th at pp. 531-532.)

26

The parties do not dispute that *Johnson* governs the standard for when a defendant who is competent to stand trial may nonetheless be precluded from self-representation, nor do they dispute that we review the trial court's decision for abuse of discretion. Where they disagree is that defendant asserts the trial court had a continuing obligation to monitor him for competence to represent himself, while the Attorney General argues trial courts do not have such a duty. We need not resolve this dispute because, even assuming the trial court had a continuing duty to assess defendant's competence for self-representation, we find no abuse of discretion on the evidence presented here.[13]

Under the *Johnson* test, we ask whether the trial court abused its discretion in concluding that it did not have before it a defendant who suffered "from a severe mental illness to the point where he [could not] carry out the basic tasks needed to present the defense without the help of counsel." (*Johnson, supra,* 53 Cal.4th at p. 530.) We conclude it did not.

At the outset of his self-representation, defendant completed a written *Faretta* waiver indicating that he did "not have any mental illness or disability or have taken any drugs, medicine or alcohol that would impair [his] abilities."[14] At the September 16 hearing on courtroom security,

---

[13] In his opening brief, defendant contended that a trial court has a continuing obligation even after a *Faretta* motion is granted to monitor a defendant's competence to represent himself, and must order a mental health exam " 'if the evidence of mental incapacity is "compelling." ' " But as the Attorney General points out, the sole authority for this proposition was a citation to a *concurring* opinion in *People v. Powell* (1986) 180 Cal.App.3d 469, 484, a case that long predates *Johnson* and *Edwards*. Defendant does not dispute in his reply brief that he cited to a concurring opinion, nor does he defend the point further.

[14] In a footnote, defendant suggests there was something questionable about this statement, since given the way the form was worded, defendant

27

Sergeant Patrick, who testified as a jail classification expert, explained that defendant's classification meant "*you do not have major mental health concerns.*"[15]

From February through to the trial in September, as we have detailed above, defendant litigated his case. He made and argued motions covering the panoply of his rights as a criminal defendant, including among others a Penal Code section 995 motion, discovery motions, a *Pitchess* motion, and a motion to suppress. He requested, obtained, and worked with, a court-appointed investigator. He subpoenaed witnesses. He cross-examined witnesses at evidentiary hearings. When the judge explained court procedures and his rights, such as jury selection and use of prior testimony for impeachment, he evidenced understanding, made connections to earlier court proceedings, and said he understood.

Defendant demonstrated persistence and legal knowledge. He argued points, cited authority, and won some motions. The trial court described the in limine motions as addressing "somewhat sophisticated legal issues." Indeed, defendant acknowledges in his brief before us that defendant was "diligent in his written advocacy, filing a multitude of pleadings."

---

checked "no" in response to the statement, "I do not have any mental illness or disability or have taken any drugs, medicine, or alcohol that would impair my abilities." The trial court interpreted the response as meaning he did not have a mental illness. But this argument is a makeweight.

To the extent, defendant is now suggesting he actually told the court the opposite because he checked the box for "no" rather than "yes," the transcript of the hearing demonstrates the court and defendant understood that he was claiming he was able to represent himself and was *not* impaired by mental illness.

[15] Defendant, too, was adamant he was "not a mental health issue," and denied he had ever talked with jail mental health staff.

Defendant's theme from the beginning of the proceedings and to its conclusion was that he was pepper sprayed unreasonably at the shopping mall, reacted as he did on account of his PTSD, lost his job as a result of the arrest, and was falsely imprisoned.  This theme was consistent with his distrust that he could get a fair resolution in the legal system, which was also apparent from the beginning of the criminal proceedings.  He did not trust his jailers who he said mistreated him and against whom he allegedly filed grievances.  He had multiple negative experiences with public defenders and made *Marsden* motions.  He did not trust the authenticity of the videotape evidence; he was concerned the prosecutor might tamper with evidence.  He came to believe that the judge was biased against him, and belatedly attempted to exercise a peremptory challenge and then disqualify the judge. He did not believe the court followed the correct procedure in addressing the disqualification issue.  He did not think he could get a fair trial from a jury. But distrust of authority is not necessarily a sign of mental illness.  As the court observed, defendant's sense that the trial was "rigged against him" may stem "from Mr. Tamrat's own personal experiences that he is relating to."

Defendant's behavior was sometimes rude and obstreperous, and he sometimes resorted to insults and profanity, but as Sergeant Patrick observed, defendant's outbursts usually came after he "receive[d] negative information or things d[id] not go in the direction he" wanted.  Again, the court reasonably could have determined defendant's verbal outbursts were not evidence of mental illness. And although voicing disrespect may have undermined the effectiveness of his advocacy and risked being subjected to sanctions (which were never imposed), it did not mean defendant was incompetent to represent himself.  (See *People v. Taylor* (2009) 47 Cal.4th

29

850, 866 ["self-representation more often than not results in detriment to the defendant, if not outright unfairness"].)[16]

Defendant argues his statement about the FBI, his uncle's statement about his paranoia, the testimony at the courtroom security hearing about his behavior in jail, and his decision to absent himself from trial *compel* the conclusion that he was "incompetent to represent himself." The Attorney General responds that even assuming defendant's statements about the FBI and the uncle's statements were indicative of "mental instability" that does not mean defendant was unable to " 'carry out the basic tasks needed to present the defense without the help of counsel,' " citing *Johnson, supra,* 53 Cal.4th at page 530. We think the Attorney General has the better argument, in light of all we have described about defendant's consistent ability to actually carry out the basic tasks of his defense all the while displaying some conspiratorial and perhaps paranoid views.

Further, the trial judge's contemporaneous observations are critical. As of September 17, the trial judge estimated defendant had appeared before him 20 times or more. The court characterized the motions in limine hearings as "almost three full days with Mr. Tamrat discussing somewhat sophisticated legal issues," and noting he "seems to be following along." Addressing directly the issue of defendant's announcements that the proceedings were rigged against him, the court said this could "show some paranoia," but "this can also be from Mr. Tamrat's own personal experiences that he is relating to," an apparent reference to the circumstances that led to

---

[16] We can only speculate how defendant would have conducted himself if he had not voluntarily absented himself from the courtroom. But that is not our inquiry here. A defendant in a felony case such as this one has a right not to be present, defendant here chose that course, and he does not raise his absence as an alternative ground for appeal.

defendant's arrest and prosecution in this case. Based on what the court had observed, defendant's "comments about a chip in his body from the FBI" did not "interfere with his ability to understand the nature of the charges and to represent himself in this matter." Defendant agreed with this point, and without profanity. About a week later, as jury selection was about to begin without defendant, the trial court reiterated its reasons for finding defendant competent to represent himself, notwithstanding defendant's decision to absent himself from the proceedings. The court characterized that decision as "not new or aberrant behavior." Rather, "he knows what he's doing . . . his conduct is calculated here . . . and is consistent with his belief that he cannot get a fair trial even if he participated in any way."

The trial court also suspected gamesmanship on defendant's part. Faced with an increasing barrage of verbal insults from defendant as jury selection loomed, the trial court, patient throughout, observed that defendant was "trying whatever you need to do to get some reaction from me so you can challenge me in this case." To the trial court's credit, it persisted with patience and solicitude.[17]

Defendant points to the prosecutor's statement that by absenting himself from trial, defendant put any conviction at risk and that the most prudent course might be to revoke his right to represent himself to protect the record. But in the end, after the trial court explained why it would proceed with the jury trial, as we have described above, the prosecutor submitted on the court's ruling.

---

[17] Defendant was already planning for writs and his appeal, requesting transcripts and telling the court in objection to one ruling that if he was denied the relief he sought that was "about . . . the 10th reason I could appeal this case if I get falsely convicted."

31

In sum, defendant exercised and persistently maintained his right to represent himself. The trial court repeatedly offered to appoint the public defender throughout the proceedings, and defendant repeatedly rejected this option. The trial court on this record did not abuse its discretion in allowing the self-representation to proceed without holding a mental competency hearing.

B.

Senate Bill No. 567 (2021-2022 Reg. Sess.) amends Penal Code section 1170 effective January 1, 2022. Newly enacted section 1170(b)(6) provides in relevant part, "[U]nless the court finds that the aggravating circumstances outweigh the mitigating circumstances that imposition of the lower term would be contrary to the interests of justice, the court shall order imposition of the lower term if any of the following was a contributing factor in the commission of the offense: [¶] (A) The person has experienced psychological, physical, or childhood trauma, including, but not limited to, abuse, neglect, exploitation, or sexual violence."

After we filed our initial opinion on November 30, 2021, we granted rehearing to consider defendant's claim that he is entitled to a reduction in his sentence under section 1170(b)(6). The Attorney General recognizes the new sentencing provision applies to defendant. Because the new law is ameliorative and defendant's case will not be final by January 1, 2022, we agree with the parties that defendant is entitled to the benefit of section 1170(b)(6). (See *People v. Conley* (2016) 63 Cal.4th 646, 657 [under the rule of *In re Estrada* (1965) 63 Cal.2d 740, 744-745, courts infer, "in the absence of contrary indications, a legislative body ordinarily intends for ameliorative changes to the criminal law to extend as broadly as possible, distinguishing only as necessary between sentences that are final and sentences that are

not"]; *People v. Superior Court (Lara)* (2018) 4 Cal.5th 299, 308–309 [applying *Estrada* rule and concluding Proposition 57 applied retroactively because it was an ameliorative change to the criminal law and nothing in the law rebutted inference of intent to extend the benefit as broadly as possible].)

Defendant argues that remand is not necessary because the trial court's findings at sentencing "*conclusively* establish that [he] is entitled to a lower term" under the new law and, therefore, the Court of Appeal can resentence defendant. (Italics added.) We are not prepared to reach this conclusion without remanding to the trial court. When the trial court sentenced defendant, section 1170(b)(6) had not been enacted, and thus the court had no reason to consider such issues as whether defendant experienced trauma that was "a contributing factor in the commission of the offense[s]" and whether "aggravating circumstances outweigh the mitigating circumstances" such that "imposition of the lower term would be contrary to the interests of justice" as specified under the new law. The trial court is in a much better position than we are to make these factual findings and so we will remand the matter to allow the trial court to sentence defendant under section 1170(b)(6) in the first instance.

## DISPOSITION

The sentence is vacated and the matter is remanded to the trial court to sentence defendant under Penal Code section 1170 as amended by Senate Bill No. 567. The judgment is otherwise affirmed.

_____

Miller, J.

WE CONCUR:

_____

Stewart, Acting P.J.

_____

Kline, J.[*]

A159390, *People v. Tamrat*

---

[*] Assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.